70 A.3d 665

JAMES FLOOD, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF KEISHA FLOOD, PLAINTIFF–APPEL-LANT/CROSS–RESPONDENT, v. BHANU ALURI–VALLA-BHANENI, M.D. AND IMAGING SUBSPECIALISTS OF NORTH JERSEY, LLC, DEFENDANTS–RESPONDENTS/CROSS–AP-PELLANTS.

Superior Court of New Jersey
Appellate Division

Argued January 29, 2013—Decided June 13, 2013.

Before Judges MESSANO, LIHOTZ and KENNEDY.

*Daniel A. Levy* argued the cause for appellant/cross-respondent (*Raff & Raff, LLP,* attorneys; *Mr. Levy,* on the brief).

*Heather M. LaBombardi* argued the cause for respondents/cross-appellants (*Giblin & Combs, LLC,* attorneys; *Ms. LaBombardi* and *Craig S. Combs,* on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiff, James Flood, is the father of Keisha Flood and the administrator of her estate. On November 4, 2006, Keisha was evaluated at St. Joseph's Hospital (St. Joseph), after complaining of abdominal pain, and released.[1] Two days later, Keisha returned with similar complaints and underwent evaluation by emergency room doctors before her admission. A CT scan was conducted on the morning of November 7, 2006, and read by defendant Dr. Bhanu Aluri–Vallabhaneni (Aluri), a radiologist.

It was alleged that Aluri issued two reports that morning, one transcribed at 7:38 a.m., a second at 7:39 a.m. It was further alleged that Aluri did not contact anyone with the results and that this was a deviation from accepted medical standards. Later that day, at approximately 1:50 p.m., Keisha went into cardiac arrest and was pronounced dead at 2:24 p.m. For purposes of this appeal

---

[1] To avoid confusion, we will occasionally refer to family members by their first names. We intend no disrespect by this informality.

only, we accept plaintiff's contention that Keisha died of cardiac arrest following sepsis resulting from a "small bowel obstruction."

Plaintiff filed suit alleging medical malpractice against St. Joseph and numerous physicians that attended Keisha. In a second amended complaint, filed more than four years after Keisha's death on February 18, 2011, plaintiff for the first time named Aluri and her employer, defendant Imaging Subspecialists of North Jersey, LLC (Imaging), as defendants. On April 4, defendants filed their answer and subsequently moved to dismiss the wrongful death claims, contending the statute of limitations had expired. The trial judge denied defendants' motion.

During trial, several of the originally-named defendants settled with plaintiff, and two others were dismissed from the case.[2] Ultimately, the case proceeded to the jury only as to Aluri.[3]

We have not been provided with any transcript of the charge conference, which the judge conducted off the record with the attorneys. We do not condone such practice. *See R.* 1:8–7(a) ("The court shall, on the record, rule on the requests prior to closing arguments to the jury. A verbatim record shall be made of any charge conference the court holds.").

However, in their briefs, the parties have set forth what transpired during this initial conference, and there appears to be little dispute. The judge indicated his intention to charge the jury utilizing *Model Jury Charge (Civil)* 5.50E "Pre-existing Condition—Increased Risk/Loss of Chance—Proximate Cause," (May 2010). The proposed verdict sheet initially prepared by the court incorporated the first two interrogatories appended to the model

---

[2] Based on the record provided, which was significantly abbreviated by apparent consent of the parties, it is unclear when and how these various defendants settled or were dismissed from the suit.

[3] It appears that there was no claim that Imaging was independently negligent. We assume that it was undisputed Aluri was acting in her capacity as an employee of Imaging, and the jury was only asked to consider Aluri's negligence. We use the singular defendant or Aluri throughout the balance of this opinion.

charge, i.e., the jury was asked to consider whether plaintiff proved Aluri deviated from accepted medical standards and whether that deviation increased the risk of harm posed by Keisha's "pre-existing condition."

As to each settling defendant, the court's proposed interrogatories then asked whether Aluri had proven that the doctor deviated from acceptable medical standards and if that doctor's deviation increased the risk of harm posed by Keisha's pre-existing condition. Question 11 then asked the jury to state "whether the increased risk was a substantial factor in causing Keisha['s] ... death by stating in percentages, what portion of the death [was] a result from ... the pre-existing condition," Aluri's "deviation from the standard of care," and deviation of each of settling doctor. The jury was instructed that "[t]he total must equal 100%[,]" and "[i]f 100% of the damages [were] determined to be due to the pre-existing condition, then return your verdict for [Aluri]. If any percentages of the damages [were] a result of ... Aluri's deviation, then proceed to question #12." Question 12 was the damages question, as to Keisha's pain and suffering, and question 13 asked the jury to determine the pecuniary damages associated with Keisha's wrongful death.

It is undisputed that defense counsel submitted a different set of jury interrogatories. We gather from the parties' briefs, defendant contended that because several doctors had settled, the jury interrogatories should specifically ask: 1) whether Aluri deviated from accepted medical standards; 2) whether that deviation increased the risk of harm from Keisha's pre-existing condition, i.e., her bowel obstruction; and 3) whether the increased risk was a "substantial factor" in causing Keisha's death. Defense counsel submitted interrogatories that asked the jury to consider those three questions first.

Defendant contended that only if the jury answered those three questions affirmatively should it then consider whether Aluri had proven as to each of the settling doctors whether that doctor deviated from accepted medical standards, whether those devia-

tions similarly increased the risk of harm to Keisha and whether the increased risk from each particular settling doctors' deviation was a substantial factor in causing Keisha's death. The ultimate apportionment question—the extent to which Keisha's death resulted from her pre-existing condition and to what extent it resulted from each doctor's negligence—would abide the results of the jury's answers as to Aluri and each settling doctor.

On the record, plaintiff objected to defendant's proposed interrogatories, noting that the third question proposed by Aluri did not conform to those appended to the model charge and would "lead[ ] to confusion." The judge overruled the objection and agreed to submit the interrogatories proposed by defendants. As a result, the judge submitted a verdict sheet that asked the following three questions first:

1. Has the plaintiff proven by preponderance of the evidence that Dr. Aluri deviated from accepted standards of medical practice?

(Please circle your answer) Yes No Record your vote: _____

If you answered "Yes" to question # 1, go to question # 2. If you answered "No" to question # 1[,] cease deliberations.

2. Has the plaintiff proven that Dr. Aluri's deviation increased the risk of harm posed by the plaintiff's pre-existing condition?

(Please circle your answer) Yes No Record your vote: _____

If you answered "Yes" to question # 2[,] go to question # 3. If you answered "No" to question # 2[,] cease deliberations[.]

3. Was the increased risk a substantial factor in causing the decedent's death?

(Please circle your answer) Yes No Record your vote: _____

If you answered "Yes" to question # [3,] go to question # [4]. If you answered "No" to question # 3[,] cease deliberations[.]

The ten-person jury deliberated and returned a verdict in favor of defendant. It found, by a vote of 8–2, that Aluri had "deviated from accepted standards of medical practice." It found by a similar vote that the "deviation increased the risk of harm posed by [Keisha's] pre-existing condition." However, by a vote of 10–0, the jury concluded that the "increased risk was not a substantial factor in causing [Keisha's] death." The judge entered judgment in favor of Aluri, and plaintiff now appeals.

Before us, plaintiff raises the following issues for our consideration:

Point 1: This court should review the trial court's ruling de novo and remand for a new trial because the error was not harmless

Point 2: The trial judge committed reversible error by departing from Model Charge 5.50E and the Model Jury Interrogatories

A) The trial judge should have used the Model Interrogatories, which conform to the case law, rather than changing, deleting, and adding new questions

B) The jury was confused when they were incorrectly told to answer a yes/no question about substantial factor

C) The error was amplified since the jury was never given instructions on the minimum percentage of fault that would constitute a "substantial factor"

D) The jury was then given an impermissible "bridge question" that linked the facts that the plaintiff had to prove with those that Dr. Aluri had to prove

E) The verdict sheet eliminated an important contention that Dr. Aluri had to prove

Aluri cross-appeals, contending that any claim against Aluri and Imaging for Keisha's wrongful death was barred by the applicable statute of limitations.

We have considered these arguments in light of the record and appropriate legal standards. We affirm the judgment under review; as a result, we do not consider the cross-appeal and dismiss.

## I.

No issue in the field of medical malpractice litigation has spawned as much discussion and debate as the proper method by which a jury should assess whether a doctor's negligence proximately caused injury to a patient who suffers an ultimate consequence attributable to that negligence alone, or in some combination with a pre-existing medical condition. Because this appeal brings into stark relief the changing landscape of guidance issued by our Supreme Court in a series of decisions, the response of the Committee on Model Civil Jury Charges to those decisions and the impact upon trial judges who struggle regularly as a result, we are compelled to provide some background.

In *Evers v. Dollinger*, 95 *N.J.* 399, 413–17, 471 *A.*2d 405 (1984), the Court addressed the issue of causation in the context of allegations that the defendant doctor's negligence exacerbated a plaintiff's preexisting illness, and, in combination, caused the plaintiff's ultimate condition. In reversing a no cause verdict in favor of the defendant doctor, the *Evers* Court held that on remand,

> [the] plaintiff should be permitted to demonstrate, within a reasonable degree of medical probability, that the seven months delay resulting from defendant's failure to have made an accurate diagnosis and to have rendered proper treatment *increased the risk* of recurrence or of distant spread of plaintiff's cancer, *and that such increased risk was a substantial factor* in producing the condition from which plaintiff currently suffers.
>
> [*Id.* at 417, 471 *A.*2d 405 (emphasis added).]

Only six years later, in *Scafidi v. Seiler*, 119 *N.J.* 93, 101–09, 574 *A.*2d 398 (1990), the Court again addressed the issue of causation. As summarized by the Court, in *Scafidi*, "the proofs presented as a factual issue whether the defendant's failure properly to treat and arrest [the plaintiff's] early labor proximately caused the premature birth and death of her infant child." *Id.* at 96, 574 *A.*2d 398. Adhering to its earlier decision in *Evers*, the Court said, "[e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment *increased the risk of harm* posed by a preexistent condition raises a jury question *whether the increased risk was a substantial factor* in producing the ultimate result." *Id.* at 108, 574 *A.*2d 398 (emphasis added). The Court explained:

> The rationale underlying *the use of a two-pronged jury instruction* bears elaboration. Because this modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm—the jury is first asked to verify ... that the deviation is within the class, i.e., that it *increased the risk of harm* from the preexistent condition. *Assuming that the jury determines that the deviation increased the risk of harm* from the preexistent condition, *we use the "substantial factor" test of causation* because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes.
>
> [*Id.* at 108–09, 574 *A.*2d 398 (emphasis added) (internal citations omitted).]

Importantly, the Court noted "[t]he 'substantial factor' standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Id.* at 109, 574 *A.*2d 398.

The *Scafidi* Court then considered whether "a plaintiff's recovery in *Evers*-type cases should ordinarily be limited to lost-chance damages." *Id.* at 112, 574 *A.*2d 398 (citations omitted). The Court determined that "a rule that limits a plaintiff's damages in *Evers*-type cases to the value of the lost chance of recovery is an essential complement to *Evers*' modification of the proof required to establish proximate causation." *Ibid.* The Court stated:

> On retrial the trial court will instruct the jury on causation in the manner prescribed by *Evers v. Dollinger, supra,* 95 *N.J.* at 417 [471 *A.*2d 405]. Consistent with *Fosgate v. Corona,* [66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974) ], to the extent that [the] defendant seeks to apportion damages, defendant must produce evidence tending to show that the infant's premature birth and death could have been attributable solely to the preexistent condition, irrespective of defendant's negligence. . . . Based on the evidence adduced, the jury will be instructed to determine the likelihood, on a percentage basis, that the infant's birth and death would have occurred even if defendant's treatment was faultless. In the event of a jury verdict against defendant on liability and damages, the trial court will mold the verdict to limit defendant's liability to the value of the lost chance for recovery attributable to defendant's negligence.
>
> [*Id.* at 113–14, 574 *A.*2d 398.]

"In view of the significant change in the law represented by [its] holding," the Court applied the holding to the case at issue and, otherwise, prospectively. *Id.* at 114, 574 *A.*2d 398.

The model jury charge adopted as a result, *Model Jury Charge (Civil)* 5.36E "Pre-existing Condition—Increased Risk/Loss Chance—Proximate Cause" (Apr. 1996), noted its intended use in cases where "the plaintiff has a pre-existing condition and the defendant's negligence increases the risk of harm by depriving the plaintiff of a chance of recovery, thus permitting a modified standard of proximate cause pursuant to *Scafidi.* . . ." *Id.* at 1.

The body of the charge clearly delineated the burden of proof required of the plaintiff regarding proximate cause in such a case, i.e., did the deviation increase the risk of harm posed by the

plaintiff's pre-existing condition and was that increased risk a substantial factor in producing the ultimate injury? *Id.* at 1–2. Only then was the jury to consider whether the defendant proved that the ultimate outcome could be apportioned and, after that, to express in percentage terms "what is the likelihood . . . that the plaintiff's ultimate injuries . . . would have occurred even if defendant's treatment was proper." *Id.* at 2.

Appended to the charge were suggested jury interrogatories that posed three initial questions regarding the plaintiff's burden of proof.[4] Those first three questions were the same questions posed to the jury in this case. Only when all three interrogatories were answered affirmatively would the jury proceed to assess the defendant's proof as to apportionment.

In *Gardner v. Pawliw*, 150 *N.J.* 359, 362–63, 696 *A.*2d 599 (1997), the Court considered whether a similar proximate cause standard should apply when the plaintiff's claim of malpractice involved the doctor's failure to order diagnostic tests. Citing *Evers, Scafidi,* and *Anderson v. Picciotti,* 144 *N.J.* 195, 205–07, 676 *A.*2d 127 (1996), the Court reiterated that it "ha[d] lessened the traditional burden of proof on a plaintiff asserting a medical-malpractice claim for establishing proximate cause in the case of a plaintiff suffering from a preexistent condition." *Gardner, supra,* 150 *N.J.* at 375, 696 *A.*2d 599. The Court again stated the proof required from a plaintiff:

> A plaintiff suffering from a preexistent condition must prove that, as a result of a defendant's negligence, she experienced an *increased risk of harm* from that condition, *and that the increased risk of harm was a substantial factor in causing the injury ultimately sustained.*
>
> [*Ibid.* (emphasis added) (citation omitted).]

Because it would always be unknown "whether performing the [diagnostic] test would have helped to diagnose or treat a preexistent condition," to meet the first prong of the proximate cause test, "the plaintiff must demonstrate . . .. [only] that the failure to

---

[4] We have attached as Exhibit A the form interrogatories appended to the charge.

give the test increased the risk of harm from the preexistent condition[,] ... even if such tests are helpful in a small proportion of cases." *Id.* at 387, 696 *A.*2d 599. And, importantly for purposes of this case, the Court reiterated that "[u]nder the second prong of *Scafidi, it is the jury's responsibility to determine whether the increased risk of harm resulting from the failure to perform the tests was or was not a substantial factor in causing the ultimate harm sustained."* *Id.* at 389, 696 *A.*2d 599 (emphasis added).

The Court addressed the proximate cause issue once again in *Reynolds v. Gonzalez,* 172 *N.J.* 266, 280–90, 798 *A.*2d 67 (2002). It again reiterated that New Jersey courts apply the "substantial factor test in medical malpractice cases involving preexisting conditions." *Id.* at 280, 798 *A.*2d 67. Once a deviation from the accepted standard of care has been found, the Court explained the sequential analysis that follows:

[T]he first inquiry in the substantial factor analysis is whether there is evidence "demonstrating ... that negligent treatment increased the risk of harm posed by a preexistent condition." [*Scafidi, supra,* 119 *N.J.* at 108, 574 *A.*2d 398.] *Once that requirement has been satisfied, the jury next must determine whether the increased risk was a substantial factor in causing the ultimate harm.*

[*Reynolds, supra,* 172 *N.J.* at 282–83, 798 *A.*2d 67 (emphasis added) (citation omitted).]

*"Once the jury determines that the plaintiff has satisfied the two-prong inquiry, it next must address the appropriate apportionment of damages."* *Id.* at 283, 798 *A.*2d 67 (emphasis added).

The *Reynolds* Court then considered the specific issue raised by the plaintiff:

Plaintiff asserts that the substantial factor test, in addition to being confusing, is unnecessary in light of our decision in *Fosgate, supra,* limiting a plaintiff's recovery to that portion of the harm caused by a defendant's negligence. 66 *N.J.* at 272–73 [330 *A.*2d 355]. *According to plaintiff, the jury should be allowed to apportion damages once it determines that a defendant's negligence has increased the risk of harm posed by the preexisting condition. We reject that contention because plaintiff's formulation dispenses with the need for proof of any causal connection between defendant's negligence and the resultant harm.*

[*Id.* at 286, 798 *A.*2d 67 (emphasis added).]

Nonetheless, based on the facts before it, the Court concluded:

[W]e reasonably can infer that the jury's verdict may have resulted from some confusion about plaintiff's burden under the substantial factor causation test. We are persuaded that a clearer instruction on the substantial factor test would have been preferable. Because we remand for a new trial in this case, a modified substantial factor charge explaining the legal significance of the word substantial should be given to the jury on retrial.

[*Id.* at 288, 798 *A.*2d 67.]

The Court referred the matter to the Committee on Model Civil Jury Charges again, *ibid.*, and suggested, pending modification, the following instruction be used:

[A] defendant's deviation need not be the only cause, nor a primary cause, for the deviation to be a substantial factor in producing the ultimate result. However, defendant's negligent conduct cannot be a remote or an inconsequential contributing factor. It must play a role that is both relevant and significant in bringing about the ultimate injury. *The relative weight of an increased risk that is found to constitute a substantial factor can be reflected by the jury in the apportionment of damages between the increased risk and the pre-existing condition.* The trial court also should explain to the jury that

[s]ome other event [that] is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor.

[*Ibid.* (emphasis added) (quoting *Restatement (Second) of Torts* § 433 cmt. d (1965)) ]

The model charge was again revised (the Model Charge). *See Model Jury Charge (Civil)* 5.50E "Pre-existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (Feb. 2004).[5] The charge now provided:

Second, the plaintiff must prove that the increased risk was a substantial factor in producing the ultimate harm or injury. If the negligent act was only remotely or insignificantly related to the ultimate harm or injury, then the negligent act does not constitute a substantial factor.[6] However, the defendant's negligence need not be the only cause, nor even a primary cause, of an injury for the negligence to

---

5 The Model Civil Jury Charges were reorganized and renumbered in October 2007. *See* 190 *N.J.L.J.* 506 (2007).

6 To this point, the language was nearly identical to that contained in the prior model charge.

be a substantial factor in producing the ultimate harm or injury. Whether the increased risk was a substantial factor is to be reflected in the apportionment of damages between the increased risk and the preexisting condition. If under all of the circumstances . . . you find that the plaintiff may have suffered lesser injuries if the defendant was not negligent, then the defendant is liable for the plaintiff's increased injuries. On the other hand, if you find that the plaintiff would have suffered the same injuries even if the defendant was not negligent, then the defendant is not liable to the plaintiff.

[*Id.* at 2–3 (footnotes omitted).]

This instruction clearly met the directive of the *Reynolds* court to modify the "substantial factor charge explaining the legal significance of the word substantial." *Reynolds, supra,* 172 *N.J.* at 288, 798 *A.*2d 67.

The jury interrogatories appended to the revised Model Charge, however, differed significantly from the prior interrogatories.[7] Questions 1 and 2 remained the same, asking the jury to determine if the doctor had deviated from accepted standards and if the deviation increased the risk of harm to the plaintiff. Question 3, however, now focused the jury's attention on apportionment, clearly explaining that on this issue, the defendant bore the burden of proof:

3) Has the defendant proven that some portion of the plaintiff's ultimate injury would have occurred, even if the defendant's treatment was proper?

[*Model Jury Charge (Civil)* 5.50E, *supra,* at 7.]

If the jury answered question 3 affirmatively, it was directed to answer question 4:

4) State whether the increased risk was a substantial factor in causing the plaintiff's damages by stating, in percentages, what portion of the ultimate injury is a result from:

A. The pre-existing condition ____%

B. Dr. _____'s deviation from the standard of care ____%

The total must equal 100%. If 100% of the damages are determined to be due to the preexisting condition, then return your verdict for the defendant. If any percentage of the damages are the result of the defendant(s) fault, then proceed to interrogatory [five].

[*Ibid.*]

---

[7] We have attached a copy of the interrogatories appended to the Model Charge as Exhibit B.

Critical to the case before us, if the jury answered question 3 in the negative, it was directed immediately to question 5, the damages question, *ibid.,* having been told in the body of the instructions that "the defendant is responsible for all of the plaintiff's injuries unless the defendant is able to reasonably apportion the damages." *Id.* at 5. As a result, if the defendant failed to shoulder his/her burden of proof on apportionment, a jury following the model interrogatories is never asked to find whether the increased risk was a "substantial factor" in bringing about the ultimate injury. Instead, use of the model interrogatories potentially relieves the plaintiff of proving the "second-prong" of the proximate cause requirement. Such a result is simply contrary to the case law we have cited at length and was specifically rejected in *Reynolds.*

In *Verdicchio v. Ricca,* 179 *N.J.* 1, 30, 843 *A.*2d 1042 (2004), after reviewing the precedential landscape regarding the "substantial factor" test, the Court noted "[t]he relevant *Model [Jury] Charges (Civil)* ... have ... been amended to reflect our holding in *Reynolds v. Gonzalez." Id.* at 30, 843 *A.*2d 1042.[8] However, notably, before doing so, the Court again reiterated the two-pronged proximate cause requirement:

> Once the plaintiff demonstrates that the defendant's negligence actually increased the risk of an injury that later occurs, that conduct is deemed to be a cause "in fact" of the injury *and the jury must then determine the proximate cause question: whether the increased risk was a substantial factor in bringing about the harm that occurred.*
>
> [*Id.* at 24, 843 *A.*2d 1042 (emphasis added).]

"In other words, merely establishing that a defendant's negligent conduct had some effect in producing the harm does not automatically satisfy the burden of proving it was a substantial factor[.]" *Id.* at 25, 843 *A.*2d 1042.

---

[8] The Model Charge has since been revised again. *See Model Jury Charge (Civil)* 5.50E "Pre-existing condition—Increased Risk/Loss of Chance—Proximate Cause" (May 2010). There were no substantive changes in the instructions or the model interrogatories.

## II.

We return to the appeal before us. Plaintiff concedes that the judge properly instructed the jury using the Model Charge. In other words, the judge told the jury it must first consider whether plaintiff proved Aluri deviated from accepted medical standards, and then consider whether that deviation "increased the risk of harm posed by the plaintiff's preexisting condition." The judge then provided verbatim the Model Charge on "substantial factor." Plaintiff's claim of error relates solely to the interrogatories on the verdict sheet, specifically, the insertion of question 3, requiring the jury to find plaintiff proved the increased risk from Aluri's deviation was a substantial factor in bringing about Keisha's death.

A "trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous." *Sons of Thunder, Inc. v. Borden, Inc.,* 148 *N.J.* 396, 418, 690 *A.*2d 575 (1997). In reviewing a jury interrogatory for reversible error, we "consider it in the context of the charge as a whole. An accurate and thorough jury charge often can cure the potential for confusion that may be present in an interrogatory." *Ponzo v. Pelle,* 166 *N.J.* 481, 491, 766 *A.*2d 1103 (2001) (citation omitted).

The questions on the verdict sheet tracked the language of the current Model Charge and clearly explained those issues upon which plaintiff bore the burden of proof. We recognize that the questions posed in this case were not those appended to the Model Charge. However, the interrogatories used, i.e., questions 1, 2 and the disputed question 3, properly reflected the sequential analysis required by *Evers, Scafidi, Gardner, Reynolds* and *Verdicchio.* Because the charge was correct, and the questions posed on the jury verdict sheet correctly stated the law, any deviation was insignificant. *Wade v. Kessler Inst.,* 172 *N.J.* 327, 341, 798 *A.*2d 1251 (2002).

We reject plaintiff's specific arguments to the contrary. For example, plaintiff contends that the deviation from the model

interrogatories "do[es] not adequately focus the attention of the jury on the key issues." In our mind, the interrogatories used in this case explicitly focused the jury's attention on those issues for which plaintiff bore the burden of proof. As the Court explained in *Scafidi, supra,* 119 *N.J.* at 113–14, 574 *A.*2d 398, only after a plaintiff shoulders his/her burden should the jury focus its attention on the issue for which a defendant bears the burden of proof, i.e., apportionment of damages. As the *Scafidi* court noted, conceptually this is so because proof of apportionment relates solely to a limitation on damages to which the plaintiff otherwise would be entitled. *Ibid.* As we have noted, the current model interrogatories potentially relieve a plaintiff of proving the necessary elements of proximate cause by eliminating the need to prove any increased risk was a substantial factor. The *Reynolds* Court specifically rejected such a result. *See Reynolds, supra,* 172 *N.J.* at 286, 798 *A.*2d 67 (noting that would "dispense[ ] with the need for proof of any causal connection between defendant's negligence and the resultant harm"); *see also Verdicchio, supra,* 179 *N.J.* at 43, 843 *A.*2d 1042 (LaVecchia, J., dissenting) ("In permitting a relaxed proof requirement on the issue of damages to a *Scafidi* plaintiff, this Court did not ... intend that a plaintiff be able to skip the step that requires establishment of a prima facia (sic) case on causation.").

Plaintiff also argues that the addition of a separate "substantial factor" question confused the jury because it contradicted the jury charge, which stated that "[w]hether the increased risk was a substantial factor *is to be reflected in the apportionment of damages* between the increased risk and the preexisting condition." *Model Jury Charge (Civil)* 5.50E, *supra,* at 3 (emphasis added). However, this overlooks the instructions that preceded the quoted passage. The jury was first told, in accordance with the Model Charge, that "the plaintiff must prove that the increased risk was a substantial factor in producing the ultimate harm or injury." The term "substantial factor" was then defined as per the Court's directive in *Reynolds.* The interrogatories

actually used in this case did not contradict the Model Charge's language.

Plaintiff contends that any numerical answer to question 4's percentage allocation per force demonstrates plaintiff succeeded in proving the increased risk was a substantial factor. Conversely, if the jury found defendant's proportionate responsibility was zero in question 4, it would have necessarily found that plaintiff failed to prove the increased risk was a "substantial factor." Plaintiff cites to our decision in *Velazquez v. Jiminez*, 336 *N.J.Super.* 10, 763 *A.*2d 753 (App.Div.2000), *aff'd on other grounds*, 172 *N.J.* 240, 798 *A.*2d 51 (2002), in support of his position.

We find no quarrel with plaintiff's essential point, that even a small percentage allocation of damages to defendant's deviation and the accompanying increased risk is sufficient to sustain a finding that the increased risk was a substantial factor. However, in our opinion, *Velazquez* clearly points out the error attendant to the use of the Model Charge's current form interrogatories.

In *Velazquez, supra,* 336 *N.J.Super.* at 17–18, 763 *A.*2d 753, the jury found in favor of the plaintiff and determined that the plaintiffs' child's death resulted from a preexisting condition in combination with the negligence of a settling doctor, Jiminez, and Dr. Ranzini, who proceeded to trial. It apportioned the ultimate outcome as 5% from the pre-existing condition, 92% from Jiminez's negligence and 3% from Ranzini's. *Ibid.* The judge sua sponte entered judgment notwithstanding the verdict in favor of Ranzini, reasoning the jury's verdict demonstrated Ranzini was not negligent as a matter of law because, in part, the jury's percentage allocation demonstrated Ranzini's negligence was not a "substantial factor." *Id.* at 18, 31, 763 *A.*2d 753.

We reversed. Citing *Scafidi*, we noted that "where there is evidence that a defendant's negligence increased the risk of harm to the plaintiff it becomes a jury question whether that increased risk constituted a substantial factor in producing the injury, and thus was a proximate cause of the injury." *Velazquez, supra,* 336 *N.J.Super.* at 31, 763 *A.*2d 753 (citations omitted). Citing *Dubak*

*v. Burdette Tomlin Mem'l Hosp.*, 233 *N.J.Super.* 441, 452, 559 *A.*2d 424 (App.Div.), *certif. denied,* 117 *N.J.* 48, 563 *A.*2d 817 (1989), we noted that "[w]e have rejected the argument that the substantial factor test for proximate causation is linked to the percentage of negligence attributed to a particular defendant." *Ibid.* We concluded

> [t]he jury found that Dr. Ranzini's deviation from accepted standards of medical care increased the risk of harm to Conor and that this increased risk was a substantial factor in Conor's death. Because the jury's finding on proximate cause is consistent with its finding that Dr. Ranzini was 3% negligent, the proximate cause finding provided no basis to overturn the jury's verdict against Dr. Ranzini. [*Id.* at 31–32, 763 *A.*2d 753.]

We note that *Velazquez* was decided before *Reynolds,* and before the Model Charge was amended and the current interrogatories were appended thereto. Although not expressly discussed in the opinion, we conclude from the language used that the jury was utilizing the old form interrogatories, i.e., that it specifically found Ranzini deviated, the deviation increased the risk of death and the increased risk was a substantial factor in causing the death of plaintiffs' child. More importantly for our purposes, however, was our recognition in *Velazquez* that a plaintiff's proximate cause burden remained two-pronged, i.e., that the deviation increased the risk of harm *and* the increased risk was a substantial factor that led to the ultimate result. Once that burden is met, the defendant's ability to apportion damages to even a small percentage of responsibility does not negate the jury's proximate cause finding in the first instance. Such a finding only limits the damages for which the defendant is responsible. *See Scafidi, supra,* 119 *N.J.* at 113–14, 574 *A.*2d 398.

We fail to see, therefore, why, in utilizing the current interrogatories, a jury should be directed to answer question 4, which contains a necessary element of a plaintiff's case, only after a defendant has borne his/her burden of proof. Without any explicit direction to the jury, question 4 of the model interrogatories requires the jury to enter its finding on two issues for which the burdens of proof have been separately allocated by the Court, i.e.,

plaintiff's requirement to prove proximate cause by demonstrating the increased risk was a substantial factor, and defendant's obligation to prove some percentage of damages is attributable solely to the pre-existing condition. Moreover, as already noted, if a defendant fails to persuade the jury on question 3, the jury never is required to find that the increased risk was a substantial factor at all.

Plaintiff also urges it was error to deviate from the model interrogatories because the questions as posed "eliminated an important contention that ... Aluri had to prove[,]" specifically, that Keisha's death would have occurred even with proper care. *See Model Jury Charge (Civil)* 5.50E, Interrogatory 3. However, in this case, the jury never reached that issue having found that plaintiff failed to prove Aluri's negligence was a substantial factor.[9]

Lastly, plaintiff urged at oral argument that the *Reynolds* Court explicitly approved the form interrogatories appended to the Model Charge. We digress to first note that unlike many of the Supreme Court Committees that regularly file reports with the Court on a cyclical basis, seeking approval of suggested amendments to the *Rules of Court* or the *Rules of Evidence*, the Committee on Model Civil Jury Charges does not.

As a result, "[t]he New Jersey Supreme Court does not sanction or approve the Model Civil Jury Charges before publication by the Model Civil Jury Charge Committee, although the Supreme Court may, and frequently does, comment on the sufficiency of a charge in the context of a particular case." *Model Civil Jury Charges*, General Comments, *available* at http://www.judiciary.state.nj.us/civil/charges/General% 20comments.pdf. Generally speaking, the language contained in any model charge results from the considered discussion amongst experienced jurists and practitioners. *State v. R.B.*, 183 *N.J.* 308, 873 *A.*2d 511

---

[9] Plaintiff's contention that the interrogatories used contained a "bridge question" lacks sufficient merit to warrant discussion in this opinion. *R.* 2:11–3(e)(1)(E).

(2005) ("The process by which model jury charges are adopted in this State is comprehensive and thorough; our model jury charges are reviewed and refined by experienced jurists and lawyers."). But, a model jury charge does not necessarily reflect the approved language of the Court itself. Thus, only when the Court has occasion to address the contents of an adopted charge can we, a court of intermediate appellate review, the trial court and practitioners, rest assured that the language adopted is consistent with the Court's instructions. *See, e.g., Verdicchio, supra,* 179 *N.J.* at 30, 843 *A.*2d 1042 (approving instructions); *see also Morlino v. Med. Ctr. of Ocean Cnty.,* 152 *N.J.* 563, 582–90, 706 *A.*2d 721 (1998) (concluding the medical judgment charge needed modification and referring the matter to the Committee on Model Civil Jury Charges). Before us, plaintiff acknowledged that the opinion in *Reynolds* does not specifically address the form interrogatories appended to the Model Charge, and plaintiff furnished no evidence that the Court has specifically addressed and approved the propriety of the form interrogatories. We therefore reject the claim that the Court has approved the use of the model interrogatories appended to the current charge.

## III.

In sum, we affirm the judgment under review. Plaintiff failed to prove that Aluri's deviation, while increasing the risk of harm to Keisha, was a substantial factor in bringing about her death. The judge's instructions followed the language of the Model Charge, and the interrogatories used did not mislead the jury or misstate the law.

■ We are, nonetheless, firmly convinced that the Model Charge jury interrogatories are erroneous. As written, the interrogatories potentially relieve the plaintiff of his/her burden of proving both parts of the lessened proximate cause standard applicable to these types of medical malpractice lawsuits. And, as written, the jury interrogatories combine for the jury's determination in a single question two separate issues, one, for which the

plaintiff bears the initial burden of proof—proximate cause—and, a second, for which the defendant bears the burden of proof, but only after plaintiff has succeeded—apportionment of damages.

We express no opinion as to whether a single second question— "Has plaintiff proven that defendant's deviation increased the risk of harm posed by plaintiff's pre-existing condition and was the increased risk of harm a substantial factor in causing the ultimate result?"—is preferable to two separate questions. We urge the Committee on Model Civil Jury Charges to revisit the issue, and, in the interim, we specifically disapprove of the continued use of the model interrogatories as currently written.

Based upon our conclusion, we choose not to consider defendant's cross-appeal, and it is dismissed.

Affirmed.

### EXHIBIT A: CHARGE 5.36E (Apr. 1996)—Interrogatories

### JURY INTERROGATORIES

1) Did defendant Dr. _____ deviate from accepted standards of medical practice?

 _____ Yes _____ No

If your answer is "Yes", proceed to interrogatory 2).

If your answer is "No", return your verdict.

2) Did defendant Dr. _____'s deviation increase the risk of harm posed by plaintiff's pre-existing condition?

 _____ Yes _____ No

If your answer is "Yes", proceed to interrogatory 3).

If your answer is "No", return your verdict.

3) Was the increased risk a substantial factor in producing the ultimate injury?

_____ Yes _____ No

If your answer is "Yes", proceed to interrogatory 4).

If your answer is "No", return your verdict.

4) Has the defendant, Dr. _____, proven that some portion of the plaintiff's ultimate injury would have occurred even if defendant Dr. _____'s treatment was proper?

_____ Yes _____ No

If your answer is "Yes", proceed to interrogatory 5).

If your answer is "No", proceed to interrogatory 6).

5) Stated in percentages, what portion of the ultimate injury as a result from:

A. The pre-existing condition _____ %

B. Dr. _____ 's negligence

(the loss of chance). _____ %

100%

6) What amount of money would fairly and reasonably compensate plaintiff for his/her injury? $ _____

**EXHIBIT B: CHARGE 5.50E (May 2010)—Interrogatories**

## JURY INTERROGATORIES

1) Did the defendant, Dr. _____, deviate from accepted standards of medical practice?

Yes _____ If your answer is "Yes," proceed to question 2.

No _____ If your answer is "No," return your verdict for the defendant.

2) Did the defendant's, Dr. _____'s, deviation increase the risk of harm posed by the plaintiff's preexisting condition?

Yes _____ If your answer is "Yes," proceed to question 3.

No _____ If your answer is "No," return your verdict for the defendant.

—Continued

3) Has the defendant proven that some portion of the plaintiff's ultimate injury would have occurred, even if the defendant's treatment was proper?

Yes _____ If your answer is "Yes," proceed to question 4.

No _____ If your answer is "No," proceed to question 5.

4) State whether the increased risk was a substantial factor in causing the plaintiff's damages by stating, in percentages, what portion of the ultimate injury is a result from:

A. The pre-existing condition _____ %

B. Dr. _____ 's deviation from the _____ %

standard of care

Total 100% _____

**(The total must equal 100%. If 100% of the damages are determined to be due to the preexisting condition, then return your verdict for the defendant. If any percentage of the damages are the result of the defendant(s) fault, then proceed to interrogatory 5.)**

5) What amount of money would fairly and reasonably compensate the plaintiff for his/her:

 Past pain and suffering $ _____

 Future pain and suffering $ _____

 Past medical bills $ _____

 Future medical bills $ _____

 Past lost income $ _____

 Future lost income $ _____

6) What amount of money would fairly and reasonably compensate the plaintiff's spouse [*per quod claimant*] for his/her loss of services: $ _____