NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4918-13T1

RACHEL KRANZ, a minor by
her Guardian ad Litem,
SHELLY KRANZ and JONATHAN
KRANZ, Individually,

    Plaintiffs-Appellants,

v.

STEVEN SCHUSS, M.D., and
TEANECK PEDIATRICS, P.A.,

    Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **August 31, 2016**
>
> **APPELLATE DIVISION**

Argued October 26, 2015 — Decided August 31, 2016

Before Judges Messano, Simonelli and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-2066-12.

Michael B. Zerres argued the cause for appellants (Blume, Donnelly, Fried, Forte, Zerres & Molinari, P.C., attorneys; Mr. Zerres and Robin A. Donato, on the briefs).

Thomas J. Pyle, Jr., argued the cause for respondents (Post, Polak, Goodsell, MacNeill & Strauchler, P.A., attorneys; Jay Scott MacNeill, of counsel; Mr. Pyle, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

"The Comparative Negligence Act and the Joint Tortfeasors Contribution Law comprise the statutory framework for the allocation of fault when multiple parties are alleged to have contributed to the plaintiff's harm." Town of Kearny v. Brandt, 214 N.J. 76, 96 (2013). In Young v. Latta, 123 N.J. 584, 586 (1991), the Court held that, "in every case in which there are multiple defendants, whether or not a cross-claim for contribution has been filed," a non-settling tortfeasor is entitled to a credit reducing any judgment by the degree of fault allocated by the jury to a settling tortfeasor. The Court cited extensively to its seminal case of Judson v. Peoples Bank & Trust Company of Westfield, 17 N.J. 67, 92-94 (1954), aff'd on reconsideration, 25 N.J. 17, 34 (1957), and Judson's historical analysis of the Joint Tortfeasors Contribution Law (the JTCL), N.J.S.A. 2A:53A-1 to -5. Id. at 590-91. Justice Clifford wrote:

> Judson . . . provides two principles important to our implementation of the [JTCL]: that a settling tortfeasor shall have no further liability to any party beyond that provided in the terms of settlement, and that a non-settling defendant's right to a credit reflecting the settler's fair share of the amount of the verdict—regardless of the actual settlement—represents the judicial implementation of the statutory right to contribution.
>
> [Id. at 591 (emphasis added).]

After Judson, the "Court [] held that a non-settling defendant does not get an increased credit if a settling tortfeasor pays more than his or her pro rata share of the liability." Ibid. (citing Theobald v. Angelos, 44 N.J. 228 (1965)).

The subsequent passage of the Comparative Negligence Act (CNA), N.J.S.A. 2A:15-5.1 to -5.8, did not "sap[] the vitality of those principles." Id. at 592. "Pursuant to the [CNA], the finder of fact must make an allocation of causative fault between settling and non-settling defendants so that the court can calculate the amount of the credit due [to] the non-settler even though the non-settler cannot pursue a claim for contribution against the settler." Ibid. As Judge Pressler explained nearly two decades ago,

> the effect of the [CNA] was to replace the former pro rata liability of joint tortfeasors under the [JTCL], . . . with the obligation of each tortfeasor to pay damages in accordance with its own adjudicated percentage of fault. A necessary corollary of this scheme is to deny to comparative-negligence joint tortfeasors a reduction of their liability based on a plaintiff's pretrial settlement with a defendant who is never found to be liable at all. Thus, under the comparative-negligence scheme, a plaintiff is entitled to retain the proceeds of the pretrial settlement as well as the full jury verdict as allocated among all other defendants.
>
> . . . .

> [U]nless the settling defendant's percentage of liability is adjudicated at trial, there is simply no right in the adjudicated tortfeasors to a reduction of their own separately-allocated responsibility for the verdict.
>
> [Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 436-37 (App. Div. 1997).]

In this appeal, we are called upon to consider whether the motion judge correctly decided that defendants were entitled to a pro tanto credit for the amount plaintiffs obtained by way of an out-of-state settlement with tortfeasors who were never defendants in this litigation and could not have been sued in the courts of this State because New Jersey lacked personal jurisdiction. The issue is one of first impression. We conclude that the principles outlined above apply and therefore reverse.

## I.

The record is undisputed. Rachel Kranz was born in New York in December 2003 and came under the medical care of a series of doctors in New York. In January 2005, Rachel and her family moved to New Jersey, where she began receiving pediatric care from defendant, Steven Schuss, M.D., and his affiliated practice group, Teaneck Pediatrics (collectively, defendants).[1]

---

[1] To avoid confusion, we sometimes use the first names of the plaintiffs. We intend no disrespect by this informality.

At Rachel's medical check-up in January 2006, Dr. Schuss suspected that she suffered from left hip dysplasia. These suspicions were confirmed, and Rachel underwent open reduction surgery and a second follow-up surgery to correct the condition.

On July 30, 2007, with her mother Shelley acting as guardian ad litem (GAL), Rachel commenced suit in New York alleging medical malpractice against the hospital of her birth and several doctors (the New York defendants) who had attended to her prior to the family's move to New Jersey, claiming damages resulting from the failure to diagnose the dysplasia. On April 7, 2011, the New York court entered an order approving a structured settlement in the amount of $2 million (the New York settlement).

On March 12, 2012, once again with her mother acting as GAL, and now joined by her father, Jonathan, as a plaintiff on his own behalf, Rachel filed a complaint in New Jersey alleging medical negligence by defendants in their failure to timely diagnose and treat Rachel's dysplasia. It suffices to say that plaintiffs' experts opined that defendants' failure to diagnose the dysplasia earlier was a breach of the professional standard of care and likely increased the probability that Rachel would require open reduction surgery to address her condition and that she would likely develop arthritis in later life. At least one

of plaintiffs' experts opined in his report that certain findings, in particular the asymmetry of Rachel's gait and rotation of her hips, most likely would have been present at the age of six months, i.e., before she came under defendants' care. Defendants' experts, to the contrary, essentially concluded there was no breach of professional standards because Rachel's dysplasia was not clinically detectable until age two, and Dr. Schuss properly and timely diagnosed the condition and recommended further treatment as appropriate.

After discovery ended in December 2013, defendants sought an order providing them with a credit of $2 million against any judgment returned in plaintiffs' favor. Plaintiffs opposed the motion and cross-moved for an order barring defendants from 1) serving any new expert reports, and 2) referring to, or offering evidence of, the New York settlement at trial.

Acknowledging that "[t]he case law in New Jersey doesn't seem to give [] any clear definitive answer as to what to do in a case like we have here," defense counsel argued that plaintiffs were seeking damages for "the exact same harm" as in the New York litigation. Plaintiffs' counsel also acknowledged the unique procedural circumstances.

Addressing the judge's concern of a potential "windfall," particularly in light of plaintiffs' application to bar any

further defense expert reports or any mention of the New York settlement, plaintiffs' counsel stated, "I don't know that there's any way to truly avoid a windfall . . . . However, there [are] public policy decisions in New Jersey saying that where it really truly is unavoidable like it is here, it should inure [to] the injured party." Counsel also acknowledged that, separate from any apportionment between the New York defendants and these defendants, the jury might need to apportion responsibility for the ultimate consequence of any delay in diagnosing Rachel's injury. See, e.g., Flood v. Aluri-Vallabhaneni, 431 N.J. Super. 365, 372-79 (App. Div.) (explaining the burden of proof and apportionment in failure to diagnose medical malpractice cases), certif. denied, 216 N.J. 14 (2013).

Recognizing the lack of any precedent squarely on point and without an extensive statement of reasons, the judge concluded on "general principles of equity . . . that it would be a windfall to the plaintiff[s]" if a $2 million credit was not applied to any verdict in their favor. The judge entered the February 28, 2014 order under review that provided defendants with a $2 million credit "based upon the plaintiffs['] previously pending and now resolved New York State action involving the same claims of negligence and compensating the

plaintiff for the same injuries that are at issue in the instant litigation." The order further stated that $2 million dollars would be deducted from any verdict "rendered by a jury against [d]efendants," who "shall only be responsible for the remainder of the verdict after the credit is applied . . . ."[2]

The parties thereafter appeared before the Civil Division presiding judge, and plaintiffs voluntarily dismissed their complaint pursuant to an agreement placed on the record, which we have reviewed. Despite the voluntary dismissal of the complaint, we conclude that the February 28, 2014 interlocutory order is reviewable as of right. See Janicky v. Point Bay Fuel, Inc., 410 N.J. Super. 203, 207 (App. Div. 2009) (explaining that even a consent judgment may be appealable as of right if an "economic stake" hinges on resolution of the appeal).

## II.

Because the appeal presents a purely legal issue, we review de novo the judge's decision to give defendants a pro tanto credit for the amount of the New York settlement. Brandt, supra, 214 N.J. at 96.

For purposes of the JTCL, "'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same

---

[2] The judge did not address the cross-motion and no separate order was entered.

injury to person or property, whether or not judgment has been recovered against all or some of them." N.J.S.A. 2A:53A-1.

> Where injury or damage is suffered by any person as a result of the wrongful act, neglect or default of joint tortfeasors, and the person so suffering injury or damage recovers a money judgment or judgments for such injury or damage against one or more of the joint tortfeasors, either in one action or in separate actions, and any one of the joint tortfeasors pays such judgment in whole or in part, he shall be entitled to recover contribution from the other joint tortfeasor or joint tortfeasors for the excess so paid over his pro rata share . . . .
>
> [N.J.S.A. 2A:53A-3 (emphasis added).]

The right to contribution flows from "'joint liability and not joint, common or concurrent negligence.'" Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 72 (2004) (quoting Farren v. N.J. Tpk. Auth., 31 N.J. Super. 356, 362 (App. Div. 1954)). "'When one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share.'" Cockerline v. Menendez, 411 N.J. Super. 596, 618 (App. Div.) (quoting Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 569 (1980)), certif. denied, 201 N.J. 499 (2010).

The CNA, in turn, requires the fact finder to determine "[t]he extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of

each party shall be based on 100% and the total of all percentages of negligence or fault of <u>all the parties to a suit</u> shall be 100%." <u>N.J.S.A.</u> 2A:15-5.2(a)(2) (emphasis added). "[T]he statutes' objectives are best served when the factfinder evaluates the fault of all potentially responsible parties." <u>Brandt</u>, <u>supra</u>, 214 <u>N.J.</u> at 102. Simply put, "[t]he law favors apportionment even where the apportionment proofs are imprecise, allowing only for rough apportionment by the trier of fact." <u>Boryszewski v. Burke</u>, 380 <u>N.J. Super.</u> 361, 384 (App. Div. 2005), <u>certif. denied</u>, 186 <u>N.J.</u> 242 (2006).

Plaintiffs argue that the motion judge accorded defendants a "windfall," because given the statutory scheme, there is no legal authority for a pro tanto credit equal to the amount of the New York settlement. They note that if the New York defendants were parties to the suit, defendants would not receive a credit for the full settlement amount, but rather would be entitled to a credit based only upon an allocation of fault to the New York defendants.[3]

---

[3] Plaintiffs also contend that their cross-motion to bar any further discovery and bar defendants from introducing any evidence of the New York settlement should have been granted. As a result, defendants, who have not produced any proof of the New York defendants' liability, are not entitled to any allocation of fault or resulting credit. We deal with these issues later in this opinion.

Defendants argue the collateral source rule, <u>N.J.S.A.</u> 2A:15-97, and general notions of public policy support the judge's decision. We disagree.

The "primary effect" of the collateral source rule "was to eliminate double recovery to plaintiffs." <u>Perreira v. Rediger</u>, 169 <u>N.J.</u> 399, 409 (2001). However, by its terms, the collateral source rule does not apply when a plaintiff receives benefits for injuries caused by a joint tortfeasor. <u>N.J.S.A.</u> 2A:15-97.

Defendants argue the New York defendants could not be "joint tortfeasors" because they "were not, and could never have been . . . parties to the New Jersey action." We discuss the significance of that below. However, defendants urged the motion judge to grant them a pro tanto credit precisely because plaintiffs were seeking damages for "the exact same harm" as alleged in the New York litigation. The judge accepted this argument, because his order provided that the New York litigation "involv[ed] the same claims of negligence and compensat[ed] the plaintiff for the same injuries that are at issue in the instant litigation." Although defendants deny any negligence, it would appear from the record before us that the New York defendants and defendants are not successive tortfeasors, but rather joint tortfeasors, whose alleged

11

collective negligence delayed the diagnosis of Rachel's dysplasia.[4]

We also reject defendants' public policy arguments. Defendants argue that under New York law, they would be entitled to a pro tanto credit for the settlement plaintiffs reached with the New York defendants. See Williams v. Niske, 81 N.Y.2d 437, 440 (1993) (explaining New York's General Obligations Law § 15-108(a)). Defendants contend that permitting a pro tanto credit discourages forum shopping, such as occurred here. However, the statutory interplay we described above is evidence of New Jersey's public policy, and granting defendants a pro tanto credit is contrary to that policy.

We must address, nevertheless, defendants' implicit argument that apportionment under N.J.S.A. 2A:15-5.2(a)(2) is inappropriate because the New York defendants could not have been joined in the same suit. In other words, they could never

---

[4] As noted, one of plaintiffs' experts opined in his report that certain symptoms of Rachel's dysplasia were observable before defendants began their care. The record does not include the expert reports from the New York litigation; however, the "verified bill of particulars" from that suit includes allegations that the New York defendants, among other things, failed to "timely recognize the presence of left hip dysplasia." Because we are reversing and requiring the re-opening of discovery, we hasten to add that our conclusion that the New York defendants and defendants are joint tortfeasors is based solely upon the record before us, and we do not foreclose a contrary conclusion if further discovery proves otherwise.

have been parties.  See ibid. (emphasis added) (the fact finder must determine the "extent, in the form of a percentage, of each party's negligence or fault").

We start by recognizing that our courts have permitted apportionment of fault by the factfinder in a variety of circumstances, even though a joint tortfeasor is no longer a party in the suit.  For example, as already noted, in Young, supra, 123 N.J. at 596, the Court held that, even in the absence of a specifically-pled cross claim for contribution, a non-settling tortfeasor was entitled to a credit based upon the allocation of fault to the settling defendant who was no longer in the litigation.  In Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 116 (2004), the Court similarly held that a non-settling tortfeasor was entitled to have any award reduced by the percentage of fault attributable to a joint tortfeasor dismissed from the litigation due to a discharge in bankruptcy. In Brandt, supra, 214 N.J. at 103-04, the Court held that the non-settling defendants were entitled to have the jury allocate fault as to the defendants dismissed from the litigation because of the statute of repose.  N.J.S.A. 2A:14-1.1(a).  And, in Burt v. West Jersey Health Systems, 339 N.J. Super. 296, 307-08 (App. Div. 2001), we held that the plaintiff's recovery should be reduced by the percentage of fault allocated to those defendants

dismissed from the litigation because the plaintiff failed to comply with the Affidavit of Merit Statute, N.J.S.A. 2A:53A-26 to -29.

In some cases, however, the joint tortfeasor's absence from the suit at its inception has barred a defendant's right to apportionment. See, e.g., Ramos v. Browning Ferris Indus. of S. Jersey, Inc., 103 N.J. 177, 184 (1986) (no right to apportionment against an employer immune from liability under the Workers' Compensation Act); Bencivenga v. J.J.A.M.M., Inc., 258 N.J. Super. 399, 406-07 (App. Div.) (no right to apportionment against a fictitiously-named defendant not identified or served prior to trial), certif. denied, 130 N.J. 598 (1992); but see Cockerline, supra, 411 N.J. Super. at 617-19 (concluding that, based upon public policy concerns, apportionment was appropriate as against fictitious phantom drivers who allegedly caused the accident). Apportionment was not permitted in Ramos and Bencivenga because "as a matter of law, [the] defendant[s] could not under any circumstances be [] joint tortfeasor[s] under [the JTCL]." Brandt, supra, 214 N.J. at 102 (citing Brodsky, supra, 181 N.J. at 115).

In this case, the New York defendants were never parties to this suit, nor could they have been, because it is undisputed that New Jersey lacked personal jurisdiction over them.

14

Plaintiffs, however, argue that the circumstances are "almost-identical" to the facts presented in Carter v. University of Medicine and Dentistry of New Jersey, 854 F. Supp. 310 (D.N.J. 1994).

In Carter, plaintiffs filed two separate but concurrent actions. Id. at 311. One, filed in the Superior Court for the District of Columbia, alleged the failure on the part of a Washington, D.C., doctor to diagnosis and treat their infant son's congenital brain condition while under the doctor's care, i.e., after he was seven months of age. Id. at 311-12. The parents filed a second suit in federal district court in New Jersey making similar claims against New Jersey medical providers for the period of time before the family moved to Maryland, while their son was under their care, i.e., from birth to the age of six and one-half months. Ibid. Plaintiffs settled with the Washington, D.C., physician, and the New Jersey defendants moved in limine to have the jury apportion the "causative fault between the settling and nonsettling defendants." Id. at 312. The plaintiffs sought to preclude the defendants from asserting the Washington, D.C., doctor was negligent or that his negligence contributed to their son's condition. Id. at 311.

Examining at length the JTCL, the CNA and precedent we cited above, the judge rejected the plaintiffs' argument that apportionment was improper because the settling doctor was "not technically a party to this lawsuit and hence cannot be a joint tortfeasor within the meaning of the relevant statutes." Id. at 314. The judge concluded that the "splitting of the action for purely jurisdictional purposes does not vitiate [the Washington, D.C., doctor's] status as a settling defendant insofar as this action is concerned." Id. at 315. The judge said the claims against all the defendants were "identical and inextricably interwoven," explaining:

> [D]istilled to its purest essence, the New Jersey action concerns the alleged misdiagnosis of the infant plaintiff's hydrocephalic condition from birth to [six and one-half] months of age, while the Washington action was predicated on a simple extension of that purported misdiagnosis from seven to eighteen months. Thus, given the fact that the Washington, D.C. lawsuit is distinguishable from the present action only by jurisdictional happenstance, it logically (and equitably) follows that the jury in this case should be entitled to consider the relative fault of the settling Washington, D.C. physician.
>
> [Ibid.]

Defendants' attempts to distinguish Carter are wholly without merit. They note the Washington, D.C., settlement agreement specifically permitted a reduction in damages in the

16

New Jersey litigation by the percentage of liability attributed to the settling doctor, that certain experts were the same in both cases and the suits were pending at the same time. However, the JTCL and the CNA permit the non-settling tortfeasor a reduction of damages without regard to whether it is expressly permitted by a settlement agreement. There is nothing in this record to demonstrate defendants are unable to obtain the name of plaintiffs' experts in the New York action and depose them, thereby establishing their status as joint tortfeasors and obtaining the benefit of apportionment under the JTCL and the CNA. Although this case was not prosecuted concurrently with the New York case, as a minor, Rachel's cause of action did not have to be commenced in New Jersey until two years after she turned eighteen years of age, N.J.S.A. 2A:14-2.[5] We might conclude the lack of concurrent litigation mattered if defendants were in fact prejudiced by the delay in prosecuting the New Jersey suit, but we fail to see any prejudice to defendants' contribution rights. See, e.g., Mettinger v. Globe Slicing Mach. Co., 153 N.J. 371, 387 (1998) (a defendant's claim

---

[5] We assume the claim was not for medical malpractice resulting in "injuries sustained at birth," which has a different limitations period. N.J.S.A. 2A:14-2(b).

for contribution does not accrue until the plaintiff recovers a judgement against it).[6]

The lack of actual prejudice is compelling. In <u>Yousef v. General Dynamics Corp.</u>, 205 <u>N.J.</u> 543, 548 (2011), the Court considered whether a suit brought in New Jersey by New Jersey residents injured while on a business trip in South Africa due to the alleged negligence of the defendant corporation and its employee-driver, a resident of Florida, should be dismissed under the doctrine of <u>forum non conveniens</u>. The defendants argued that the suit should have been brought in South Africa. <u>Id.</u> at 551.

Although the facts involving the accident were disputed, the front-seat passenger of the car said that a stop sign regulating the unilluminated intersection where the crash occurred was bent, making it difficult to see. <u>Ibid.</u> Defendants also obtained information from a South African witness corroborating the condition of the sign and stating that the intersection was the site of frequent accidents. <u>Id.</u> at 552. Additionally, there were provisions of South African law that mostly favored the defendants and would have the likely result of limiting any award of damages. <u>Id.</u> at 553.

---

[6] Defendants have not, for example, claimed that they would be unable to obtain contribution in a subsequent federal diversity action.

We affirmed the trial court's decision denying the defendants' motion to dismiss. Id. at 555-56. The Court conducted an exhaustive review of the equitable considerations that underpin the doctrine of forum non conveniens, and noting "[a]t least presumptively, a plaintiff is entitled to his choice of forum," the Court concluded that the "defendants failed to carry their burden of demonstrating that New Jersey [was] a 'demonstrably inappropriate' forum." Id. at 567.

Addressing specifically the defendants' argument that they were prejudiced by the lack of ability to implead the South African municipality as a third-party defendant, the Court said:

> Because the South African municipality cannot be impleaded as a party, New Jersey's [CNA], which only applies to "parties," does not permit allocation of fault between defendants and the non-party municipality. See N.J.S.A. 2A:15-5.2(a)(2) ("The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%." (emphasis added)). Assuming that defendants have taken steps necessary to preserve their rights against the municipality under South African law, and assuming that there is adequate evidence to support a claim of municipal liability going to the jury, the trial court may consider -- as a matter of equity -- allowing the jury to consider apportioning fault between defendants and the municipality. In this way, the disadvantage to defendants in trying this case in New Jersey will be greatly diminished if, in the event of a determination of liability, they can

19

> apportion damages in a way consistent with the [CNA].
>
> [Id. at 570-71.]

Although the federal district court's decision in Carter is not controlling, we believe its reasoning, tempered by the Court's dicta in Yousef, is persuasive. Defendants' "all-or-nothing" defense may undercut their ability to prove that the New York defendants were in fact negligent, thereby denying defendants, at the least, the benefit of apportionment. That strategic decision, however, is not prejudice that inexorably results from application of the JTCL and the CNA to the unique circumstances of this case.

We are convinced that equity is not achieved by providing defendants with a pro tanto credit in this litigation for the amount of the New York settlement. That result is an undeserved windfall for defendants, and it finds no support in relevant case law. The equitable result is to permit defendants to have any judgment that plaintiffs may secure against them reduced by the amount of fault a jury attributes to the New York defendants. We are therefore compelled to reverse the order under review.

Finally, plaintiffs claim that their cross-motion should have been granted, discovery should have been closed, and defendants should have been barred from furnishing any further

20

expert reports or introducing evidence regarding the New York settlement. The natural consequence of plaintiffs' argument is that defendants are not entitled to any credit, because they proffered no evidence establishing that the settling defendants were negligent, and, hence, no basis for a jury to apportion fault.

In light of our decision which completely upends the posture of the litigation, we conclude the result urged by plaintiffs is unfair. We therefore direct the Law Division to reinstate the complaint, re-open the discovery period and provide the parties with a reasonable amount of additional time to conduct discovery and serve additional reports, anticipating the likelihood of discovery that might necessarily cross state lines.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION